**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

MITCHELL YOUNG, *et al.*,

      Plaintiffs,

v.                                     Case No. 1:18CV851

JEFFREY L. NEWTON, *et al.*,

      Defendants.

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

The Defendants, Former Superintendent Jeffery L. Newton ("Newton"), Captain Donald Langley ("Langley"), Captain Laura Gray ("Gray"), and Riverside Regional Jail Authority ("Riverside") (collectively referred to as "RRJ Defendants"), by counsel, pursuant to Federal Rule of Civil Procedure 56, submit the following in support of their motion for summary judgment:

Mitchell Young ("Young"), Dominic Robertson ("Robertson"), Desmond Horton ("Horton") and Chris Mayo ("Mayo") (collectively referred to as "Plaintiffs"), current and former inmates of Riverside Regional Jail ("RRJ"), have filed a Second Amended Complaint ("Complaint") pursuant to 42 U.S.C. 1983 alleging violation of their constitutional rights under the First Amendment, Eighth Amendment, Fourteenth Amendment, the Religious Land Use and Institutionalized Persons Act ("RLUIPA") and the Virginia Constitution.

Plaintiffs' allegations arise out of incidents they alleged occurred while at RRJ. Plaintiffs have brought suit against the RRJ Defendants in both their official and individual capacities and are seeking monetary damages, declaratory relief, injunctive relief, and attorney's fees and costs.

## I.      Statement of Undisputed Material Facts

1.      Plaintiff Young was previously an inmate at RRJ from April 2018 until October 26, 2018. (Mitchell Young Dep. 8:13-14 and 26:2-5, July 22, 2019, attached as **Exhibit A.**) While he

was an inmate at RRJ, he resided in Housing Unit 3E. (Ex. A 9:5-14.)

2.      Plaintiff Robertson was previously an inmate at RRJ from March 2018 until December 12, 2018. (Dominic Robertson Dep. 19:1-9 and 67:17-18, July 9, 2019, attached as **Exhibit B**.) While he was an inmate at RRJ, he resided in Housing Unit 3E. (Ex. B 9:25-10:1; Ex. C 9:6-7.)

3.      Plaintiff Horton is currently an inmate at RRJ residing in Housing Unit 3E and has resided there since coming to RRJ. (Desmond Horton Dep. 9:6-7, 10:4-6, July 3, 2019, attached as **Exhibit C**.)

4.      Plaintiff Mayo was previously an inmate at RRJ and his current whereabouts are unknown. (Second Am. Compl. ¶ 15, ECF No. 10.) While he was an inmate at RRJ, he resided in Housing Unit 3E. (Ex. A 9:15-18.)

5.      Defendant Newton was Superintendent of RRJ from August 1, 2011 until November 30, 2018. (Jeffery Newton Dep. 8:11-14, July 11, 2019, attached as **Exhibit D**.)

6.      Defendant Langley was Chief of Security at RRJ from March 2017 until June 1, 2019. (Donald Langley Dep. 17:3-7, July 1, 2019, attached as **Exhibit E**.)

7.      Defendant Gray was Chief of Programs from January 2018 until June 1, 2019. (Laura Gray Dep. 14:12-17, July 2, 2019, attached as **Exhibit F**.)

8.      Defendant Riverside Regional Jail Authority operates RRJ which is located at 500 Folar Trail, N Prince George, VA 23860. (William Wilson Dep. 12:17-19, Aug. 5, 2019, attached as **Exhibit G**.)

9.      Defendant Tyone Keith ("Keith") was the Food Services Director at RRJ from late 2017 to March 2019. (Tyone Keith Dep. 17:10-13, July 1, 2019, attached as **Exhibit H**.)   Keith was an employee of Trinity Services Group, Inc. ("Trinity"). (Ex. H 10:14-17.)

10. Defendant Joe Collins ("Collins" or "Chaplain") was the Lead Chaplain at RRJ from 1997 to present. (Joe Collins Dep. 10:1-15, July 12, 2019, attached as **Exhibit I**.) Collins is employed by Good News Jail & Prison Ministry ("Good News"). (Ex. I 9:21-22.)

11. Young has had no personal interactions with Newton, Gray or Langley. (Ex. A 10:12-25, 11:1-9.)

12. Robertson has had no personal interactions with Newton or Gray and does not know who Langley is. (Ex. B 7:5-22.)

13. Horton has had no personal interactions with Newton, Gray or Langley. (Ex. C 10:7-25, 11:1-6.)

14. Riverside entered into a contract with Compass Group USA, Inc. dated December 12, 2011 (the "Food Service Contract"). (Affidavit of Michelle Jackson, at ¶5, attached as **Exhibit J**; Food Service Contract, authenticated at Affidavit of Michelle Jackson, Exhibit 2.)

15. Pursuant to the Food Service Contract, the scope of services to be provided by Compass Group USA, Inc. included serving inmate meals (including special meals, holiday meals and catered events) and staff meals; providing sample menus; furnishing all disposable and consumable items; providing all staff and management for the jail Food Service Program, including any needed equipment not provided by Riverside. (Ex. J at ¶5, Ex. 2 at Trinity 000006-000013.)

16. The Food Service Contract covered a period of performance from December 12, 2011 through December 11, 2016 and provided for five one-year renewals. (Ex. J at ¶5; 30(b)(6) Michael Phillips Dep. 11:2-11, July 16, 2019, attached as **Exhibit K**.)

17.     Trinity Services Group, Inc. prepares all meals in the kitchen. (Ex. H 54:3-5.) Common Fare meals are prepared in a separate kitchen than regular meals. (30(b)(6) Jennifer Sowers Dep. 34:11-12, July 16, 2019, attached as **Exhibit L**.)

18.     Trinity prepares different menus, including a regular menu, vegetarian menu, a Common Fare menu for inmates who adhere to a religious diet, and special medical menus based on inmate medical needs. (Ex. L 17:14-22, 26:14-17.)

19.     Trinity follows the Virginia guidelines for the provision of common fare or religious meals, which mirror the federal guidelines for common fare meals, at RRJ. (Ex. L 35:12-22, 36:1-7.)

20.     Jennifer Sowers ("Sowers") is a regional dietician employed by Trinity. (Ex. L 11:7-11). As regional dietician, Sowers' duties include approving and signing menus and approving the nutritional content of religious diets. (Ex. L 17:14-22.)

21.     Sowers also provides "nutritional adequacy statements" to RRJ in compliance with the American Correctional Association ("ACA") audits aimed at making sure ACA standards are being met at RRJ. (Ex. L 28:4-14.)

22.     Once a quarter, an employee from Trinity assesses the meals served at RRJ as compared with the menu to be followed. (Ex. L 73:3-13.)

23.     Inmates at RRJ receive an average of 2900 calories per day based on a week of meals, but never less than an average of 2500 calories per day based on a week of meals. (Ex. L 49:14-20, 50:3-11.)

24.     An average of 4500 meals are served to inmates per day at RRJ, not including bagged lunches or snack bags. (Ex. H 33:18-22.)

25.     Kitchen workers place prepared meals on trays, which are color-coded to designate which menu the meal is from.  (Ex. H 59:9-17.)

26.     Kitchen workers make the meal trays inside the kitchen, put them on a cart and then set the cart in the hallway. The inmates or the officer then comes from the pod to retrieve the cart and take them to the pod. (Ex. H 53-54.)

27.     The Common Fare menu is the only religious diet offered at RRJ. (Ex. F 56:3-10.)

28.     The Common Fare menu contains no pork, beef, chicken, or other meat product, instead using textured vegetable protein, eggs, tuna and peanut butter to provide protein. (Ex. H 70:20-22, 71:1; Ex. L 36:21-37:2, 41:1-15, 45:9-19 and 46:17-20.)

29.     As Chief of Security, one of Langley's duties was to oversee the food services department to ensure that the Food Service Contract was being followed. (Ex. E 21:20-22.)

30.     Inmates at RRJ may initiate their request to receive the Common Fare menu through the Chaplain's Office. (Ex. I 281:3-9.)

31.     Young requested to receive a Common Fare diet in early May 2018 by contacting the Chaplain via the kiosk. (Ex. A 37:24-25, 38:2-24.) Young then completed a questionnaire in connection with his request to be placed on a Common Fare diet and his request was approved. (Ex. A 40:13-16, 42:24-25, 43:1-2.)

32.     Robertson requested to receive a Common Fare diet sometime after March 2018 by contacting the Chaplain via the kiosk. (Ex. B 21:20-22, 21:25-22:7.) Robertson then completed a questionnaire in connection with his request to be placed on a Common Fare diet and his request was initially denied. (Ex. B 22:3-7, 23:20-24-6.)

33.     Horton was not on a Common Fare diet during Ramadan in 2018. (Ex. C 103:12-14.) Horton did not request to receive a Common Fare diet until October or November of 2018 by

asking a volunteer chaplain and then later by sending a kiosk request to a chaplain. (Ex. C 25:1-21.) Horton then completed a questionnaire in connection with his request to be placed on a Common Fare diet and his request was approved. (Ex. C 27:22-24, 28:5-7.)

34.     Riverside entered into a contract with Good News dated January 1, 2018 (the "Good News Contract"). (Ex. J at ¶ 4; Non-Denominational Chaplain Services Contract, authenticated at Affidavit of Michelle Jackson, Exhibit 1.)

35.     Pursuant to the Good News Contract, the scope of services to be provided by Good News included evaluating, developing, and implementing faith specific programming throughout the jail; providing comprehensive chaplaincy services to inmates; coordinating all religious services to the inmates of the jail through worship services, religious education and personal counseling; enhancing religious programs by stimulating the involvement of community clergy, religious workers, and volunteer religious groups with the inmates; facilitating access and ministry of religious volunteers for all faith traditions recognized by RRJA; plan, direct and supervise all aspects of ministry; participate in community religious activities; provide statistical information and/or reports regarding inmate religious assistance and inmate programs to the Chief of Programs as requested; and recruit and train all ministry staff and volunteers with assistance from the jail volunteer coordinator. (Ex. J at ¶4, Ex. 1, bates numbers RRJ-00319-00323.)

36.     As Chief of Programs, one of Gray's duties was to oversee the contract for ministry, specifically overseeing the duties of Chaplain Collins pursuant to the contract with Good News. (Ex. F 15:9-11, 30:4-12.)

37.     Gray had no role in setting up weekly religious worship services, weekly Bible studies or other religious study programs, in signing up inmates to receive special religious meals or scheduling religious volunteers. (Ex. F 33:7-22, 34:1, 35:6-9.)

38.    The programs department at RRJ had no role in group religious services, requests for individualized ministry, requests for religious materials or requests for religious accommodation. (Ex. F 48:1-14.)

39.    Young is familiar with the grievance procedure at RRJ. (Ex. A 29:9-11.)

40.    During Ramadan in 2018, Young filed grievances regarding late breakfast meal trays, late dinner meal trays and the caloric content of meals received. (Affidavit of Frazella Nolan, at ¶12, attached as **Exhibit M**; Grievances filed by Mitchell Young, authenticated at Affidavit of Frazella Nolan, Exhibit 3.) Young did not appeal grievances filed regarding late breakfast meal trays or the caloric intake of meals received during Ramadan in 2018. (Ex. M at Exhibit 3, RRJ-00053-00094, RRJ-00786-00791.) Young filed grievances regarding the lack of Tahleen [sic] classes and complaining that Muslims were not allowed to attend Jummah services. (Ex. M at Exhibit 3, RRJ-00087-00088.)

41.    Robertson is familiar with the grievance procedure at RRJ. (Ex. B 11:16-12:16.)

42.    During Ramadan in 2018, Robertson filed grievances regarding late breakfast meal trays which he did not appeal. (Ex. M at ¶14; Grievances filed by Domonick Robertson, authenticated at Affidavit of Frazella Nolan, Exhibit 5.) Robertson did not file grievances regarding late dinner meals trays or the caloric value of meals received during Ramadan in 2018. Robertson filed grievances complaining that Muslims are only allowed Jummah services. (Ex. M at Exhibit 5, RRJ-00115-00120, RRJ-00792-00793.)

43.    Horton is familiar with the grievance procedure at RRJ. (Ex. C 16:11-13.)

44.    Horton filed grievances regarding late breakfast meal trays and late dinner meal trays. (Ex. M at ¶13; Grievances filed by Desmond Horton, authenticated at Affidavit of Frazella Nolan, Exhibit 4.) Horton did not file grievances regarding the caloric value of meals received

during Ramadan in 2018. Horton filed a grievance complaining that there had only been one Muslim class in a three-month period while alleging that Christians had two or more classes per week. (Ex. M at Exhibit 4, RRJ-00095-00114, RRJ-00794-00797.)

45.     During Ramadan in 2018, Mayo did not file any grievances regarding late breakfast meal trays, late dinner meal trays, the caloric content of meals received or missing meals for the entirety of Ramadan. (Ex. M at ¶15; Grievances filed by Chris Mayo, authenticated at Affidavit of Frazella Nolan, Exhibit 6.) Mayo filed a grievance complaining that Muslims have only had one Tahleen [sic] class since August 9, 2018 and alleging that Christians were granted more classes. (Ex. M at Exhibit 6, RRJ-00121-00122.)  Mayo did not appeal this grievance.

46.     Young did not declare his faith as Muslim when he first arrived at RRJ, instead declaring his faith around the middle of May, beginning of June, after Ramadan had begun in 2018. (Ex. A 33:4-7, 10-16, 34:2-8.)

47.      Robertson began identifying as a Muslim shortly before Ramadan in 2018. (Ex. B 20:4-9.)

48.     Horton declared his faith when he first arrived at RRJ as Muslim. (Ex. C 23:1-5.)

49.     Ramadan is a time of religious observance by practicing Muslims. During Ramadan, practicing Muslims fast from sunrise to sunset. (Ex. C 38:15-16.)

50.     There is no written Ramadan policy at RRJ. (Affidavit of William Sanders, at ¶ 5, attached as **Exhibit N**.) There are two policies which may have bearing on Ramadan, namely the Special Diets policy and the Inmate Religious Programs Policy. (Ex. N, Special Diets policy and Inmate Religious Programs Policy, authenticated at Affidavit of William Sanders, Exhibits 1, 2.)

51.     In 2018, Ramadan commenced on May 16, 2018 and ended on approximately June 15, 2018. (Ex. A 48:25-49:3.)

52. On May 3, 2018, Chaplain Collins sent out an email to jail and kitchen staff regarding Ramadan. (Ex. H 86:14-87:5.)

53. Langley's involvement in Ramadan food service was limited to reviewing the proposed Ramadan schedule to ensure that the plan was feasible; but had no personal role in ensuring on a daily basis that Ramadan meals reach fasting inmates or coordinating Ramadan meals. (Ex. E 42:12-22, 43:5-8, 45:9-11.)

54. The provision of meals during Ramadan was the responsibility of the food service department including Trinity, the pod officers and the supervisors within the housing unit. (Ex. E 43:9-13.)

55. A Ramadan Roster identified inmates who wished to participate in Ramadan, as well as their housing units and the types of meals to be provided to each inmate listed. (Ex. H 79:19-80:9 and 92:15-20.)

56. During Ramadan, inmates receive the same breakfast or dinner meal they would have received if it was not Ramadan. (Ex. H 92:5-11, 21-22; 93:1-3, 9-13.)

57. Inmates participating in Ramadan at RRJ receive a cold breakfast meal before dawn and a hot dinner meal after sunset. (Ex. H 150:17-20, 152:17-19; Ex. K 22:11-22; and Ex. L 60:5-9.) Inmates participating in Ramadan also receive a cold bagged "lunch" with their dinner to replace the lunch they did not receive due to their fast. (Ex. H 152:17-19 and Ex. K 30:16-22.)

58. Bagged meals contain two sandwiches made with luncheon meat that does not contain pork, amongst other items. (Ex. L 61:6-9, 62:6-19.)

59. Inmates would contact the Chaplain in order to be placed on the Ramadan Roster. (Ex. H 101:5-8)

60.     Robertson and Horton contacted the Chaplain via the kiosk to be placed on the Ramadan Roster. (Ex. B 29:9-17, Ex. C 61:4-14.)

61.     During Ramadan, Robertson would sometimes eat dinner meals, even when they were cold. (Ex. B 32:7-9.) During Ramadan, Horton ate dinner meals even when they were late and cold. (Ex. C 47:21-48:1.)

62.     During Ramadan, when a meal tray appeared to be insufficient with regards to calories, Horton did not refuse the meal but ate it. (Ex. C 58:4-7.)

63.     Outside religious volunteers may apply to serve the religious needs of inmates at RRJ by submitting an application to the Chaplain's Office. If the Chaplain's Office preliminarily accepts a volunteer, RRJ then conducts a background check. (Ex. F 22:4-18, 22:22-23:17.)

64.     Once a background check clears, the Chief of Programs receives the background check and religious volunteer application for review. If the Chief of Programs approves the application, final approval is then sought from the Assistant Superintendent. (Ex. F 22:18-20, 23:18-21.)

65.     In 2018, a volunteer Imam, Imam Rashid, provided two Taleem classes and Jummah services to Muslim inmates at RRJ. (Ex. A 46:16-20, 25, 47:1-12; Ex. C 78:7-11.)

66.     Jummah services are still being offered at RRJ by Imam Rashid. (Ex. C 78:7-11; Ex. G 72:16-21.)

67.     Young was given a Quran upon his arrival at RRJ. (Ex. A 12:18-19, 125:1-4.)

68.     The Chaplain gave Robertson a Quran while he was an inmate at RRJ. (Ex. B 49:11-15.)

69.     Robertson did not reach out to any outside Imam, organization or Masjid to get more information on the Muslim faith while in RRJ. (Ex. B 54:15-23.)

70.     Horton possesses a Quran which he is able to access and use on a regular basis while in RRJ. (Ex. C 82:10-14.) Horton has been afforded access to Muslim materials in the RRJ library, including a Quran, prayer pamphlet, a book referred to as "Prophet Muhammed," and a book referred to as "Science of the Quran," all of which could be requested. (Ex. C 82:17-24, 83:1-22.)

71.     Horton has never requested that the RRJ library carry Muslim materials other than the ones it currently carries. (Ex. C 85:25-86:4.) Horton has not reached out to any Muslim organizations or Masjids in the area surrounding RRJ in order to get assistance. (Ex. C 89:8-13.)

72.     Young did not check whether the library at RRJ carried Islamic materials other than the Quran and the prayer schedule. (Ex. A 127:7-10, 14-16.) Young did not make a request to the Chaplain for specific Islamic materials that he desired. (Ex. A 127:17-128:11.) Young did not reach out to any Muslim organizations or Masjids in the area surrounding RRJ in order to get assistance while he was an inmate there. (Ex. A 132:6-9.)

73.     The Life Learning Program was a program for inmates at RRJ from approximately October 2018 to December 2018. (Ex. I 160:4-6, 248:3-7.)

74.     The Life Learning Program was proposed by Chaplain Collins in 2016 and his proposal was agreed to by Newton who was then the Superintendent. (Ex. D 111:2-12, 112:1-2, 13-16.)

75.     The Life Learning Program was housed in housing unit five as were at least two other programs, the opioid addiction program and the veterans' program. (Ex. F 107:3-19; Ex. D 218:9-12, 219:2-17.) The pod where the Life Learning Program was housed was a 24-person unit which was previously dormant with no inmates living there. (Ex. D 116:9-16, 118:5-6.)

76.     The Life Learning Program pod had a microwave as did other pods. (Ex. D 118:17-

18, 243:9-10.)

77.     Participants in the Life Learning Program received the same privileges as other inmates who were in minimum custody and who were participants in other programs. (Ex. D 245:11-21.) Lockdown was the same for participants in the Life Learning Program as it was for all other inmates who were in minimum custody. (Ex. D 248:7-11.)

78.     The RRJ programs department did not set the criteria for participation in the Life Learning Program. (Ex. F 109:9-12.) The Chaplain handled the application process for the Life Learning Program. (Ex. I 229:2-10.)

79.     Volunteers conducted interviews of inmates applying to the Life Learning Program and made recommendations to the Chaplain regarding those inmates who appeared to be good candidates. (Ex. I 229:17-22, 230:1-4.)

80.     Horton believed that you did not have to be a Christian to participate in the Life Learning Program and that Muslims could apply. (Ex. C 70:12-17.) Horton applied to be in the Life Learning Program. (Ex. C 70:18-19.)

81.     Although Young visited the medical department at RRJ to receive medications for pre-existing migraines and allergies, during those visits Young did not seek medical attention for weight loss during Ramadan in 2018. (Ex. A 88:1-17, 135:12-14, 135:21-136:4.)

82.     Robertson did not seek medical attention at RRJ for weight loss or headaches during Ramadan in 2018. (Ex. B 56:9-13, 57:2-6, 58:16-19.)

83.     Horton did not seek medical attention at RRJ for weight loss, headaches or dizziness during Ramadan in 2018. (Ex. C 93:14-16, 23-25.)

84.     Young, Robertson and Horton testified that the alleged difficulties they each faced practicing their faith at RRJ did not cause them to violate their religious beliefs. (Ex. A 132:2-5;

Ex. B 56:2-5; Ex. C 97:16-22.)

## II. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), a motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The essence of the inquiry for the court is "whether the evidence presents a sufficient disagreement to require submission to the jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion" and the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. After that required showing, however, the party opposing the motion must set forth specific facts, supported by evidence, showing there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. The opposing party may not rest on the mere pleadings. *Celotex*, 477 U.S. at 324. "In determining whether summary judgment is appropriate, courts determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Odom v. South Carolina Dept. of Corrections,* 349 F.3d 765, 769 (4th Cir. 2003). A mere scintilla of proof will not prevent the entry of summary judgment. *Peters v. Jenney,* 327 F.3d 307, 314 (4th Cir. 2003).

## III. Argument

### Newton, Langley and Gray are protected by Qualified Immunity

Defendants are entitled to the defense of qualified immunity in their individual capacities there being no allegations of conduct which violated clearly established statutory or constitutional

13

rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). Qualified immunity involves a three-step analysis. First, the court must determine "whether plaintiffs' allegations if true, establish a statutory or constitutional violation." *Couch v. Jabe,* 479 F. Supp. 2d 569, 598 (W.D. Va. 2006). Second, the court must "inquire whether at the time of the alleged violation [the right] was clearly established." *Id*. Third, the court must determine whether a "reasonable person in the official's position would have known that his conduct would violate that right." *Id*.

RRJ Defendants assert that the Plaintiffs' allegations even if true would fail to establish a statutory or constitutional violation for the reasons discussed *infra*. However, even assuming that the Plaintiffs have established claims of statutory and constitutional violations and their rights at the time of the alleged violations were clearly established, a reasonable person in the positions held by Newton, Langley and Gray would not have known that their conduct violates any such statutory or constitutional rights. Newton, Langley or Gray had no personal interaction with the Plaintiffs and there is no evidence of intent to deprive the Defendants of any rights. Accordingly, the RRJ Defendants are immune from suit.

**Newton, Langley and Gray had no personal involvement in the alleged constitutional deprivation suffered by the Plaintiffs.**

Normally, "[i]n order for an individual to be liable under § 1983, it must be 'affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights.'" *See, e.g.*, *Garraghty v. Com. of Va., Dept. of Corrections*, 52 F.3d 1274, 1280 (4th Cir. 1995) (quoting *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977)). *Respondeat superior* is not a basis for liability in an action under 42 U.S.C. § 1983. All three Plaintiffs deposed have testified that they had no personal interactions whatsoever with Newton, Langley or Gray.

To the extent that the Plaintiffs wish to argue that the denial of a second level grievance on appeal by Langley or Gray, such is insufficient to establish an administrator's involvement in the actual deprivation of a constitutional or statutory right. *De'Lonta v. Johnson*, No. 7:11-cv-00175, 2012 U.S. Dist. LEXIS 98705, at *23 (W.D. Va. July 17, 2012).

**Plaintiffs may not recover monetary damages pursuant to RLUIPA.**

Plaintiffs cannot recover damages under RLUIPA against defendants sued in their official capacities. *Booker v. Robinson*, 1:14cv555, 2017, 2017 U.S. Dist. LEXIS 176440, at *7 (E.D. Va. Feb. 14, 2017); *Madison v. Virginia*, 474 F.3d 118 (4th Cir. 2006). Plaintiffs are also barred from recovery for damages against defendants in their individual capacities. *Booker*, 2017 U.S. Dist. LEXIS 176440, *7; *Rendelman v. Rouse*, 569 F.3d 182 (4th Cir. 2009). Accordingly, Plaintiffs' claims for monetary damages pursuant to RLUIPA against the individual defendants must be dismissed.

**Mootness**

A prisoner's transfer or release from a particular prison moots his claims for injunctive and declaratory relief with respect to his incarceration there. *Rendelman v. Rouse* 569 F.3d 182, 186 (4th Cir. 2009). Young, Robertson and Mayo were released from RRJ in 2018. Therefore, their claims for injunctive and declaratory relief are moot and must be dismissed.

**Defendants Failed to Exhaust Their Administrative Remedies**

The Prison Litigation Reform Act ("PLRA") requires all inmates to fully exhaust their administrative remedies as a mandatory prerequisite to the initiation of any § 1983 suit. Subsection (a) of 42 U.S.C. § 1997(e) provides: "No action shall be brought with respect to prison conditions under § 1983 of this Title, or any other federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available have been

exhausted."

Exhaustion of remedies is mandatory and is required "regardless of the relief offered through administrative procedures." *Booth v. Churner*, 532 U.S. 731 (2001). Actions may not be brought pursuant to RLUIPA without first exhausting all available administrative remedies. *See* 42 U.S.C. § 2000cc-2(e) (nothing in RLUIPA "shall be construed to amend or repeal the Prison Litigation Reform Act of 1995"); *Cutter v. Wilkinson*, 544 U.S. 709, 723 n. 12 (2005).

In order to satisfy the exhaustion requirement, the inmate must file a grievance raising the claim and pursue the grievance through all available levels of appeal. *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). The purpose of the exhaustion requirement is "to reduce the quantity and improve the quality of prisoner suits" by "afford[ing] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter*, 534 U.S. at 524–25.

Based upon an analysis of the grievances filed by the Plaintiffs, Horton, Robertson and Mayo did not file any grievances claiming the inadequacy of the caloric value of the meals they were provided during Ramadan. And although Young filed grievances regarding the caloric value of his meals during Ramadan, he did not appeal the grievance response he received.

With regards to the late delivery of breakfast meal trays during Ramadan, Young, Robertson and Mayo grieved the matter, but none of them fully exhausted the grievance procedure by appealing the responses received. With regards to the late delivery of dinner meal trays during Ramadan, Robertson and Mayo did not file any grievances on this point. There are no grievances filed by Mayo indicating a failure to receive all of his meals during Ramadan. With regards to common fare meals eligibility, none of the Plaintiffs filed any grievances complaining that they were subjected to a religious test in order to receive a common fare diet.

Accordingly, the Plaintiffs' collective failure to grieve the inadequacy of the calories in the

meals provided during Ramadan or the use of a questionnaire to determine common fare meals eligibility; Young, Robertson and Mayo's failure to appeal the delivery of late breakfast meal trays during Ramadan; Robertson and Mayo's failure to file any grievances regarding the late delivery of dinner meal trays during Ramadan; and Mayo's failure to file any grievances regarding the deprivation of all meals during Ramadan is fatal to these claims. As a result, these claims must be dismissed with prejudice.

**Plaintiffs Cannot Maintain an Establishment Clause Claim**

Plaintiffs claim that the RRJ Defendants violated the Establishment Clause contained in the First Amendment of the Constitution. The Establishment Clause states: "Congress shall make no law respecting an establishment of religion…." U.S. Const. amend. I. In practice, however, the Establishment Clause is meant to protect against three main evils: "'sponsorship, financial support, and active involvement of the sovereign in religious activity.'" *Lemon v. Kurtzman*, 403 U.S. 602, 612 (1972) (quoting *Walz v. Tax Comm'n*, 397 U.S. 664, 668 (1970)). The Supreme Court set forth a three-pronged test to determine whether a government action violates the Establishment Clause: (1) the action has no secular purpose; (2) the primary effect of the action is to advance or inhibit religion; or (3) the action fosters excessive entanglement with religion. *Id.* at 612–13. To show a violation of the Establishment Clause, a plaintiff must show a violation of one of the prongs. Plaintiffs cannot do that here.

In this action, Plaintiffs do not allege the presence of religious programming violates the *Lemon* test because it has no secular purpose. Indeed, Plaintiffs appear to be arguing in favor of *more* religious programming.[1] The gravamen of the analysis here is on prongs two and three:

---

[1] Even if Plaintiffs were arguing the first prong of the *Lemon* test, however, it is clear that religious programming serves *some* secular purpose in prisons, because the cases are legion approving religious programming in prisons and other public institutions. *See, e.g., Cutter v. Wilkinson*, 544 U.S. 709, 713 (2005) (government actors may

whether the RRJ Defendants' actions advanced or inhibited religion or fostered religious entanglement. In short, they did not. Plaintiffs claim that the RRJ Defendants advanced and sponsored religion by allowing Good News, a non-governmental agency, to control religious programming at the prison. (Second Am. Compl. at ¶¶ 119–125.) However, by contracting for religious programming services, RRJA did not engage in any entanglement.

Furthermore, none of the programming provided by Good News was mandatory, the critical factor in determining whether the state is sponsoring or becoming too entangled in religion. The case of *Henderson v. Berge*, 190 F. App'x 507 (7th Cir. 2006), provides the appropriate framework for this analysis. There, inmates sued for violations of the Establishment Clause because, among other things, the prison had a Christian television channel. *Id.* at 508. The Seventh Circuit Court of Appeals affirmed the trial court's grant of summary judgment for the defendants. It found that because the inmate was not forced to watch the Christian television programs, there was no violation of the Establishment Clause. *Id.* at 509 (citing *Freedom from Religion Found., Inc. v. McCallum*, 324 F.3d 880, 882–83 (7th Cir. 2003)). Courts in the Fourth Circuit have similarly held that there can be no Establishment Clause violation where inmates are not forced to be subjected to religion. *See Justus v. Southwest Va. Reg'l Jail Auth.*, No. 7:06CV00753, 2007 U.S. Dist. LEXIS 1161, at *5 n. 2 (W.D. Va. Jan. 5, 2007) (finding no viability to an Establishment Clause claim because there was no indication that the inmate was "forced, encouraged, or required to attend religions services."); *cf. Thorne v. Hale*, 1:08cv601, 2009 U.S. Dist. LEXIS 25938 (E.D.

---

accommodate religion without violating the Establishment Clause) (citing *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 144–45 (1987)); *Sch. Dist. of Abington Twp. v. Schempp*, 347 U.S. 203, 296–99 (1963) (finding that provision of chaplains to the military and in prisons was not a violation of the Establishment Clause); s*ee also Carter v. Broadlawns Med. Center*, 857 F.2d 448 (8th Cir. 1988) (upholding a finding that a county hospital did not violate the Establishment Clause by hiring a chaplain because the chaplain had a secular purpose: enhance the hospital's holistic approach to healing).

Va. Mar. 26, 2009) (refusing to dismiss an Establishment Clause claim where inmates were forced to attend religiously themed AA/NA meetings).

Here, Plaintiffs do not allege they were required to participate in any religious programming. Indeed, their Complaint clearly alleges that participation was voluntary pursuant to an inmate applying to be a part of the program. Thus, Plaintiffs' claims on this prong cannot stand.

Lastly, Plaintiffs claim that the RRJ Defendants violated the Establishment Clause by favoring Christians over other religions. Yet their Complaint belies the truth in those allegations. Plaintiffs state that the Life Learning Program is open to inmates of *all faiths*. (Second Am. Compl. at ¶ 42.) Furthermore, there are many different program-linked housing units at RRJ (*e.g.*, veterans' program, opioid addiction). All program participants, regardless of the program they are participating in, enjoy different privileges simply *because* they are in a program. Additionally, the Good News Contract explicitly required the religious programming to not only be non-denominational, but for Good News to actively seek input from members of all faiths. This demonstrates that the state, through the RRJ Defendants, was not seeking to favor any particular religion.

Plaintiffs also allege that Christian inmates received items like new Bibles and writing utensils that non-Christian inmates did not receive, but there is no proof to substantiate their allegation. (Second Am. Compl. at ¶¶ 51, 58.) However, even if such proof existed, the Establishment Clause does not require prisons to provide identical worship opportunities for every religious sect or group. *Henderson v. Berge*, 190 F. App'x 507, 509 (7th Cir. 2006) (citing *Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972)).

For the foregoing reasons, Plaintiffs cannot maintain a claim for an Establishment Clause violation and their claim must be dismissed.

19

<h1 style="text-align:center">RRJ Defendants did not violate the Eighth Amendment</h1>

To survive a motion for summary judgment on an Eighth Amendment "cruel and unusual punishment" claim, a plaintiff must prove two elements: 1) that objectively the deprivation of a basic human need was "sufficiently serious;" and 2) that subjectively the prison officials acted with a "sufficiently culpable state of mind." *Evans v. Jabe*, No. 3:11CV104, 2014 U.S. Dist. LEXIS 6454, at *17 (E.D. Va. Jan. 17, 2014) (quoting *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998)). "To satisfy the objective element of an Eighth Amendment claim, the deprivation complained of must be extreme and amount to more than the "routine discomfort [that] is part of the penalty that criminal offenders pay for their offenses against society." *Id*. at *18. Plaintiffs must produce evidence that they suffered "a serious or significant physical or emotional injury resulting from the challenged conditions." *Id*. To satisfy the subjective prong, Plaintiffs must demonstrate that "a particular defendant actually knew of and disregarded a substantial risk of serious harm" to the person of each Plaintiff. *Id.* Deliberate indifference is a high standard that will not be met by a showing of negligence. *Id*.

In *Evans*, a prison inmate brought suit pursuant to 42 U.S.C. § 1983 for violations of the Eighth Amendment and RLUIPA, alleging that during Ramadan he received incomplete or tardy breakfast meal trays on six occasions. Addressing Evans' Eighth Amendment claim, the court explained that in order to determine if an Eighth Amendment violation has occurred, courts must consider the amount and duration of the deprivation of food. *Id.* (citing *Lockamy v. Rodriguez*, 402 F. App'x 950, 951 (5th Cir. 2010) (finding deprivation of six meals in a fifty-hour period insufficient to state a claim absent allegation of injury as a result of missing meals)). Claims of inadequate nutrition without evidence of injury, physical or emotional, is insufficient to support an 8th Amendment claim. *Id*. Plaintiffs must also demonstrate that RRJ Defendants knew of and

disregarded an excessive risk to their health resulting from receiving incomplete or tardy meal trays. *Id.*

Evans failed to proffer evidence that he sustained any injury, much less a serious or significant injury, as a result of the late or incomplete meals. *Id.* at *22 Further, there was no evidence to establish that the defendants perceived that Evans faced a substantial risk of serious harm from receiving late or incomplete breakfast meal trays. *Id.* at *23

The Plaintiffs in the instant case allege that their Eighth Amendment rights were violated when 1) they were served meals which did not meet the proper caloric intake of between 2600 and 2800 calories on any given day during Ramadan (Second Am. Compl. ¶¶ 142–43); 2) for 20 out of the 30 days of Ramadan in 2018, Young, Robertson and Horton received their breakfast meal trays after sunrise forcing them to forego those meals in accordance with their religious beliefs (Second Am. Compl. ¶¶ 142–43); and 3) Mayo received no meals at all during the last half of Ramadan upon his conversion to Islam (Second Am. Compl. ¶¶ 142–43).

During their depositions, Horton, Robertson and Young claimed that they suffered weight loss as well as headaches. Horton also alleged experiencing dizziness. However, aside from their bare allegations, none of the Plaintiffs have been able to provide evidence of physical injury. None of the Plaintiffs sought medical attention for their weight loss. Even Young, who testified to having medical visits during Ramadan in order to receive medication for unrelated, preexisting medical conditions, did not raise the issue of his weight loss during these visits. Thus, there is no evidence that any of the Plaintiffs suffered any injury, much less a serious or significant physical injury. Because each Plaintiff testified that they had no personal interactions whatsoever with Newton, Langley or Gray, none of the RRJ Defendants could have known of and disregarded a substantial risk of serious harm even if such a harm had existed. Thus, the Plaintiffs have failed to demonstrate

a violation of the Eighth Amendment and their claim must be dismissed.

**RRJ Defendants did not violate RLUIPA or the First Amendment**

The Plaintiffs allege that their rights to the free exercise of their religion under the First Amendment and RLUIPA were violated when 1) they established a policy which failed to provide Plaintiffs and other similarly situated Muslim inmates with a balanced nutritional diet containing between 2600 and 2800 calories on any given day during Ramadan (Second Am. Compl. ¶ 169); 2) Defendants failed to provide Plaintiffs and other similarly situated Muslim inmates with a pre-dawn breakfast during Ramadan (Second Am. Compl. ¶ 170); and 3) Defendants failed to provide Mayo and other similarly situated Muslim inmates with any religious meals during Ramadan at all (Second Am. Compl. ¶ 171). It is alleged that these actions placed a substantial burden on the Plaintiffs' exercise of their religion.

RLUIPA prohibits the government from imposing "a substantial burden on the religious exercise" of an inmate unless the government can demonstrate that the burden "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a). A plaintiff alleging a violation of RLUIPA bears the burden of establishing 1) that he seeks to engage in an exercise of religion and 2) that the challenged conduct substantially burdens that exercise. *Krieger v. Brown*, 496 Fed. Appx. 322, 324 (4th Cir. 2012) (citing 42 U.S.C. § 2000cc-1 (a)).

To hold the defendants liable as individuals, it must be demonstrated that the defendants acted with the requisite intent. Simple negligence, the "lowest common denominator of customary tort liability," does not suffice to meet the fault requirement under section 3 of RLUIPA. *County of Sacramento v. Lewis*, 523 U.S. 833, 848–49 (1998). "[T]he Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is

categorically beneath the threshold" of constitutional protections. *Id*. at 849.

If the plaintiff meets this burden, the burden then shifts to the government to demonstrate that the limitation on the plaintiff's religious exercise is the least restrictive means of furthering a compelling government interest. *Id*. The Supreme Court defines "substantial burden" as one which puts "substantial pressure on an adherent to modify his behavior and to violate his beliefs" or one that forces a person to "choose between following the precepts of [his] religion and forfeiting [governmental] benefits on the one hand and abandoning one of the precepts of [his] religion on the other hand." *Id*. at 187 (citing *Thomas v. Review Bd. Of Ind. Employment Sec. Div.*, 450 U.S. 707, 718 (1981)). No substantial burden occurs if the government action merely makes the "religious exercise more expensive or difficult," but fails to pressure the adherent to violate his or her religious beliefs of abandon one of the precepts of his or her religion. *Evans v. Jabe*, No. 3:11CV104, 2014 U.S. Dist. LEXIS 6454, at *26-27 (E.D. Va. Jan. 17, 2014) (quoting *Living Water Church of God v. Charter Twp. Of Meridian*, 258 Fed. Appx. 729, 739 (6th Cir. 2007)).

Like RLUIPA, the First Amendment requires that a plaintiff demonstrate that a defendant's conduct resulted in a substantial burden upon the plaintiff's exercise of his religion. *Id.* at *30. However, because RLUIPA provides greater protection for an inmate's religious exercise than does the Free Exercise Clause, where an inmate fails to put forth sufficient evidence to demonstrate a substantial burden upon the exercise of his faith under RLUIPA, he cannot prevail under the Free Exercise Clause of the First Amendment.

Ramadan Policy

There is no Ramadan-specific policy regarding meal service or the contents of Ramadan meals at RRJ. (Sanders Aff. ¶5.) RRJ has an Inmate Religious Programs policy which aims "to provide inmates the opportunity to practice their recognized religion" and a Special Diets policy

which states that the Common Fare diet is the only religious diet recognized by RRJ. (Sanders Aff. ¶6,7, Ex. 1, 2.)

Insufficient Caloric Intake

As a threshold matter, the Plaintiffs failed to exhaust their administrative remedies as to this allegation and therefore this claim is barred by the PLRA. However, examining this claim on its merits reveals that the evidence does not support the allegations made by the Plaintiffs. There has been sworn testimony provided by Sowers, the nutritionist employed by Trinity, that inmates at RRJ receive an average of 2900 calories per day based on a week of meals, but never less than an average of 2500 calories per day based on a week of meals. Keith, Sowers and Phillips testified regarding the steps taken by Trinity to ensure that meals were nutritionally sound. Sowers testified that once a quarter an employee from Trinity assesses the meal service and its compliance with the menu. Further, Sowers testified that she provided nutritional adequacy statements to RRJ required by the American Correctional Association to demonstrate compliance with its standards regarding the nutrition provided to inmates.

Aside from the testimony of Plaintiffs Young and Horton, who rely solely upon their visual acuity to determine whether the portion sizes served contained the appropriate number of calories, the evidence overwhelmingly demonstrates that the inmate meals served contained the proper caloric values and were not deficient. Accordingly, the Plaintiffs' claim on this point fails and must be dismissed.

Meals

Mayo alleges that he was deprived of all meals during Ramadan. However, Mayo's claim on this point is barred by the PLRA as he filed no grievances alleging the deprivation of all meals during Ramadan. Accordingly, this claim fails and must be dismissed.

Only Horton exhausted his administrative remedies regarding the late delivery of breakfast meal trays during Ramadan. An examination of the grievances filed by Horton indicates that he filed four first level grievances alleging the late delivery of his breakfast meal trays during Ramadan on 5/20/18, 5/22/18, 5/25/18, and 6/11/18. As a result, taking the evidence in the light most favorable to Horton, we can conclude that his breakfast meal tray was late on at least four occasions during Ramadan.

In order to substantiate a violation of RLUIPA, Horton must demonstrate that missing four breakfast meal trays constituted a substantial burden on his practice of Islam during the 30-day long observance of Ramadan. To meet this burden, Horton must demonstrate that the denial of these meals was "more than an inconvenience" to his religious practice. *Evans,* 2014 U.S. Dist. LEXIS 6454, at \*26. No substantial burden occurs if the government action merely makes the "religious exercise more expensive or difficult" but fails to pressure the adherent to violate his religious beliefs. *Id.* at \*27 (citing *Living Water Church of God v. Charter Twp. Of Meridian,* 258 Fed. Appx. 729, 739 (6th Cir. 2007)). In *Evans v. Jabe*, the Court held that the receipt of six incomplete or tardy breakfast trays after daylight fasting had begun did not amount to a substantial burden on the inmate's observance of Ramadan and was merely an inconvenience upon his religious practice.[2] *Id.* Like the plaintiff in *Evans*, Horton similarly cannot demonstrate a substantial burden upon his religious exercise due to missing four breakfast meal trays.

The record establishes that Horton received his dinner meal as well as the bagged meal to

---

[2] Multiple courts have similarly concluded that there is no substantial burden under analogous facts. *See Norwood v. Strada*, 249 F. App'x 269, 271–72 (3rd Cir. 2007) (finding no substantial burden when inmate denied seven religiously certified (halal) meals during three-day lockdown); *Neal v. McKune*, 11-3155-JTM, 2013 U.S. Dist. LEXIS 50769, at \*5-6 (D. Kan. Apr. 9, 2013) (finding no substantial burden but an "inconvenience," when inmate alleged three missed and six hurried breakfasts during Ramadan in light of the availability of religiously acceptable dinner.)

replace his lunch meal during Ramadan. While Horton argues that his dinner meal was sometimes late and cold, there is no evidence that the dinner meal was late or cold on the days that he alleges that he missed his breakfast meal. But even more importantly, Horton testified that he ate the late or cold dinner meal trays he received. Thus, like Evans, Horton received two additional meals after the fast ended each day. Horton has provided no evidence to suggest that missing his breakfast meal trays created a substantial burden on his participation in the Ramadan fast. In fact, Horton testified that it did not cause him to violate his religious beliefs.

For these reasons, Horton cannot demonstrate that the receipt of late breakfast meal trays was a substantial burden upon his religious exercise and this claim should be dismissed. By failing to substantiate a claim under RLUIPA, Plaintiffs have similarly failed to substantiate a claim under the Free Exercise Clause of the First Amendment. And although the Plaintiffs have failed to demonstrate that a violation of RLUIPA in fact occurred, it bears noting that, at best, the failure to receive pre-dawn breakfast meal trays was due to mere negligence. There is no evidence of any intentional conduct on the part of the individual defendants to deprive Horton, or any other Muslim inmate, of meals or nutrition during Ramadan. Without evidence of intent, the individual defendants cannot be held personally liable for any violation of RLUIPA should one have occurred.

Common Fare Meals Eligibility

The Plaintiffs failed to exhaust their administrative remedies as to this allegation and therefore this claim is barred by the PLRA.

Lack of Islamic Instruction

While the Plaintiffs allege that they have been denied access to classes and materials for Islamic religious instruction, there is no evidence in the record to support this assertion. (Second

Am. Compl. ¶ 129.) All three inmates testified that they received a Quran when they requested it. All three inmates indicate that they were allowed to and in fact did attend Jummah services as well as Taleem classes when offered by the volunteer Imam. To the extent that Plaintiffs complain that they wished to have access to additional Islamic materials, none of the Plaintiffs can demonstrate that they made a specific request for materials that was denied. Plaintiffs complain that RRJ's library possessed limited Islamic reading materials but have provided no evidence to demonstrate that the absence of additional materials or additional services or classes forced them to modify their behavior, creating a substantial burden upon the practice of their faith. *See Krieger v. Brown*, 496 F. App'x 322, 326 (4th Cir. 2012) ("Because Krieger did not show that the deprivation of an outdoor worship circle and the requested sacred items modified his behavior and violated his religious beliefs, the district court correctly determined that Krieger failed to establish a prima facie case under RLUIPA."); *DeSimone v. Bartow*, 355 F. App'x 44, 46 (7th Cir. 2009) ("noting the insufficiency of a plaintiff's 'unreasoned say-so' to create a triable issue") (quoting *Borzych v. Frank*, 439 F.3d 388, 390 (7th Cir.2006)); *see also, Marron v. Jabe*, No. 1:12cv468(TSE/TRJ), 2014 U.S. Dist. LEXIS 19150, 2014 WL 585850, at *5 n. 5 (E.D.Va. Feb. 14, 2014) (citations omitted) ("…generalized and non-specific explanations do not coherently or sufficiently articulate the existence of a substantial burden on plaintiffs religious practice.") (internal quotation omitted), aff'd, 582 F. App'x 210 (4th Cir. 2014).

Further, any lack of instruction was not due to actions by the RRJ Defendants but was caused solely by the unavailability of an appropriate volunteer. The RRJ Defendants could not have knowingly violated the rights of the Plaintiffs by maintaining some Islamic materials in the jail library and not others when the RRJ Defendants have no knowledge of any religious basis upon which such other materials should be made available. Accordingly, the Plaintiffs' claim on

this point fails and must be dismissed.

## Plaintiffs have Failed to State a Violation of Equal Protection

Plaintiffs allege that RRJ Defendants have established an Islamic instruction policy which prohibits Plaintiffs and other similarly situated Muslims from attending classes that teach their Islamic faith (Second Am. Compl ¶217); by establishing a Ramadan policy which fails to provide fasting Muslims with a balanced nutritional diet between 2,600 and 2,800 calories each day during Ramadan while other religious and non-religious inmates are provided with balanced nutritional meals during Ramadan (Second Am. Compl. ¶ 218); by establishing a common fare meal eligibility policy which requires Muslim inmates to submit to a religious test which is graded to determine their eligibility for the common fare religious diet while other inmates with religious dietary restrictions are subject to less onerous religious tests or deemed in satisfaction of the improper religious tests, and are able to eat the common fare meals which satisfy their religious dietary restrictions (Second Am. Compl. ¶ 219).

In order to make out an Equal Protection claim, a plaintiff must demonstrate that he has been treated differently than others with whom he is similarly situated, and that the unequal treatment was the result of intentional or purposeful discrimination. *De'Lonta v. Johnson,* No. 7:11cv175, 2012 U.S. Dist. LEXIS 89705, at *31 (W.D. Va. July 17, 2012) (citing *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)). A plaintiff must allege sufficient facts to establish that a defendant intentionally discriminated against him on the basis of religion by failing to provide him with a reasonable opportunity to pursue her faith compared to other similarly situated religious groups. *De'Lonta* at *31 (citing *Cruz v. Beto*, 405 U.S. 319, 321-322 (1972)). Plaintiff must set forth "specific, non-conclusory factual allegations that establish improper motive." *Id.* (citing *Williams v. Hansen*, 326 F.3d 569, 584 (4th Cir. 2003)).

Significantly, requiring an inmate to demonstrate a sincerely held religious need for special dietary arrangements does not necessarily mean that there has been intentional or purposeful discrimination. *Id*. at \*32. This is because allowing inmates to have a custom-made menu on request would unduly disrupt inmate meal preparation, service and costs. *Id*. Additionally, Equal Protection does not require that all religions receive identical treatment and resources. *Cruz v. Beto*, 405 U.S. 319 (1972). It is constitutionally sufficient in the prison context for prison officials to provide inmates belonging to various religions a reasonable opportunity, consistent with valid penological concerns, to practice their religion and that this opportunity must be comparable to the opportunities afforded inmates belonging to mainstream religions. *Blagman v. White*, 112 F. Supp.2d 534 (E.D. Va. 2000).

Simply requiring that inmates submit a test prior to being granted a common fare diet does not meant there has been discrimination. In this case, there is no evidence that the test administered to inmates in order to receive a common fare diet was only administered to Muslim inmates, so no Equal Protection claim can be substantiated on that point. Further, with regards to the availability of Muslim classes, services, and materials, the record demonstrates that Muslim inmates were afforded a reasonable opportunity to exercise their religious freedom. As has been previously stated, the Plaintiffs were provided with Qurans and access to other religious materials and were not prevented from participating in Ramadan and Jummah and Tahleem classes. There is no evidence that RRJ Defendants intentionally or purposefully targeted Muslim inmates for unequal treatment. Finally, common fare is the only religious diet offered to RRJ inmates and is offered regardless of the faith of the inmate requesting it. Plaintiffs' conclusory allegations, wholly unsupported by the record, are insufficient to demonstrate an Equal Protection violation and this claim must therefore be dismissed.

**Plaintiffs Cannot Substantiate a Violation of the Virginia Constitution**

Virginia Courts have "consistently held that the protections afforded under the Virginia Constitution are co-extensive with those in the United States Constitution." *Holley v. Johnson*, No. 7:08CV629, 2010 U.S. Dist. LEXIS 56356, at *21-22 (W.D. Va. June 30, 2010). As the Plaintiffs' claims pursuant to the U.S. Constitution fail as discussed *supra*, so too must any claim they raise pursuant to the Virginia Constitution. The Plaintiffs' claims under Article I, Section 16 of the Virginia Constitution must be dismissed.

**IV.    Conclusion**

For the foregoing reasons, the Defendants, Jeffery Newton, Donald Langley, Laura Gray and the Riverside Regional Jail Authority ask this Court to award them summary judgment, to dismiss this action with prejudice, and for such further relief as this Court deems just and appropriate.

Respectfully Submitted,

JEFFERY L. NEWTON, CAPTAIN DONALD
LANGLEY, CAPTAIN LAURA GRAY AND
RIVERSIDE REGIONAL JAIL AUTHORITY

By Counsel

_____/s/ Sherry A. Fox_____
Sherry A. Fox, VSB No. 72943
*Thompson*McMullan, P.C.
100 Shockoe Slip, 3rd Floor
Richmond, VA 23219
Tel: (804) 649-7545
Fax: (804) 780-1813
sfox@t-mlaw.com
*Counsel for Defendants Jeffery L. Newton,*
*Captain Donald Langley, Captain Laura Gray*
*and Riverside Regional Jail Authority*

## CERTIFICATE OF SERVICE

       I hereby certify that on the 28th day of August, 2019, I electronically filed the foregoing via the CM/ECF system and that a Notice of Electronic Filing (NEF) was thereby sent to the following counsel of record:

Lena F. Masri, Esq.
Gadeir I. Abbas, Esq.
Carolyn M. Homer, Esq.
Justin Sadowsky, Esq.
CAIR LEGAL DEFENSE FUND
453 New Jersey Ave., SE
Washington, DC  20003
lmasri@cair.com
gabbas@cair.com
chomer@cair.com
jsadowsky@cair.com
*Counsel for Plaintiffs*

Deborah Kane, Esq.
GuideOne Insurance, Legal Dept.
P.O. Box 14503
Des Moines, IA  50306
dkane@guideonelaw.com
*Counsel for Defendant Collins*

Melissa Y. York, Esq.
Harman, Claytor, Corrigan & Wellman
1940 Duke Street, Suite 200
Alexandria, Virginia 22314
myork@hccw.com
*Counsel for Defendant Keith*

       /s/ Sherry A. Fox       

Sherry A. Fox, VSB No. 72943
*Thompson*McMullan, P.C.
100 Shockoe Slip, 3rd Floor
Richmond, VA 23219
Tel: (804) 649-7545
Fax: (804) 780-1813
sfox@t-mlaw.com
*Counsel for Defendants Jeffery L. Newton,*
*Captain Donald Langley, Captain Laura Gray*
*and Riverside Regional Jail Authority*